UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Jacob Aster Fraley, ) | Civil Action No. 5:21-03849-KDW |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| Kilolo Kijakazi, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

Plaintiff Jacob Aster Fraley ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("Act"). For the reasons that follow, the Commissioner's decision is reversed and remanded for further administrative proceedings.

I.  Relevant Background

　　A.  Procedural History

Plaintiff applied for DIB and SSI on November 26, 2018,[1] alleging disability beginning April 20, 2017. Tr. 193–206. Plaintiff's applications were denied initially and on reconsideration. Tr. 92-93, 131–32. On January 27, 2021, at Plaintiff's request, Tr. 145-47, an Administrative Law Judge ("ALJ") conducted a hearing, at which the ALJ heard testimony from Plaintiff and an impartial vocational expert ("VE"), Tr. 35–61. On May 20, 2021, the ALJ issued a decision finding Plaintiff not disabled. Tr. 12–29. After granting Plaintiff an extension, Tr. 7-8, the Appeals Council issued a Notice of Appeals Council Action denying Plaintiff's request for review, making the

---

[1] Although the Application Summaries are dated December 11, 2018, Tr. 193-206, the Disability Determination Transmittals indicate a filing date of November 26, 2018, Tr. 92-93.

ALJ's decision the final decision of the Commissioner, Tr. 1–6. Plaintiff filed this action seeking review of the Commissioner's decision on November 23, 2021. ECF No. 1.

  B. Plaintiff's Background

Plaintiff was born in May 1981 and was 35 years old on his alleged disability onset date of April 20, 2017. Tr. 258. Plaintiff was 39 years old at the time of the administrative hearing. Tr. 40. In his December 15, 2018 Disability Report-Adult Plaintiff indicated that he obtained his GED in 1999, did not attend special education classes, and had completed specialized job training as a pharmacy technician in 2016. Tr. 263. Plaintiff listed his past relevant work ("PRW") as pharmacy technician (Nov. 24, 1999 – April 20, 2017) and security guard (2015-2016). *Id.* Plaintiff indicated that he stopped working because of his conditions which he listed as chronic depression, bipolar disorder, anxiety, pseudobulbar affect,[2] PTSD, and traumatic brain injury to the frontal lobe. Tr. 262. Plaintiff indicated that he was 6'3", weighed 202 pounds, and his conditions caused him pain or other symptoms. *Id.*

  C. Administrative Proceedings

Plaintiff appeared before an ALJ via telephone on January 27, 2021, along with his attorney.[3] Tr. 35. VE William Stewart also appeared and testified. *Id.*

   1. Plaintiff's Testimony

In response to questions from the ALJ Plaintiff confirmed his birthdate, his current age of 39 years old, and his address. Tr. 40. Plaintiff testified he lives in a house with his mother, and that

---

[2] Pseudobulbar affect (PBA) is a condition characterized by episodes of sudden uncontrollable and inappropriate laughing or crying. Pseudobulbar affect typically occurs in people with certain neurological conditions or injuries, which might affect the way the brain controls emotion. *See* https://www.mayoclinic.org/diseases-conditions/pseudobulbar-affect/symptoms-causes/syc-20353737 (last visited Dec. 27, 2022).
[3] Plaintiff's hearing was conducted via telephone due to COVID-19 precautions. Tr. 37.

he completed the eighth grade and obtained his GED. *Id.* Plaintiff has a driver's license and is physically able to drive. *Id.* Plaintiff previously worked in several different positions at Costco, including installing tires and as a cashier, stocker, gas station attendant, and pharmacy technician. Tr. 41. Plaintiff stopped working at Costco because of issues with his anxiety and depression. Tr. 42. He testified that he was taking leaves of absence and missing a lot of work, so he left rather than be terminated so that he could be rehired eventually. *Id.*

Plaintiff testified that he was in a severe motorcycle accident in May 2018 that left him with increased emotional problems and physical pain. Tr. 43. Plaintiff's worst physical pain is in his mid-to-lower back. *Id.* He stated his back pain is aggravated by "anything from getting out of bed to just turn[ing his] neck the wrong way." *Id.* The heaviest thing Plaintiff can lift or carry is a jug of milk and he treats his pain with Ibuprofen and Acetaminophen. Tr. 43–44. Plaintiff fractured both wrists in the motorcycle accident and has plates and screws in his right forearm. Tr. 44. He testified that he has pain and inflammation in both wrists and has trouble with buttons. *Id.* Plaintiff stated that he can shower on his own but his mother has to remind him to bathe. *Id.* He testified that he can walk for 15 minutes before needing a break, stand for 10 minutes, and sit for five or ten minutes. Tr. 44–45. Plaintiff stated that constipation and dry mouth are the two worst side effects from his medications. Tr. 45.

Plaintiff stated that he does not sleep well at night due to racing thoughts and takes a one-to-four hour long nap every day. Tr. 45. He spends his day sitting, standing, and pacing to manage his pain because he gets stiff if he stays in one spot too long. *Id.* He testified that he does not do any household chores, and that his mother does the household chores, cooking, and yardwork. Tr. 46.

Plaintiff testified that he treats with his psychiatrist, who is in Florida, over FaceTime every three months. Tr. 46. Plaintiff suffers from anxiety, depression, and psychosis. Tr. 47. He stated that he has panic attacks three times per week, crying spells every other day, no motivation, very low energy, difficulty focusing and concentrating, and nightmares four or five times a week. *Id.* During a panic attack, Plaintiff loses his breath, his chest tightens, his hands start shaking, and he sometimes loses muscle control and collapses. *Id.* He testified that his panic attacks are brought on by overwhelming thoughts about what he is going to do with the rest of his life and how he is going to live. *Id.*

In response to questions from his attorney Plaintiff testified that as a result of his motorcycle accident he has cognitive issues, including impaired short-term memory. Tr. 47-48. He is not able to drive because he suffers from post-traumatic stress from his motorcycle accident and gets scared on the road. *Id.* Plaintiff has trouble coming up with words during conversations but not when he only has to produce short answers. *Id.* Plaintiff stated that he experiences auditory hallucinations about once a day that sound like understandable conversations. Tr. 48–49. He also experiences visual hallucinations like a neighbor's house on fire or a bright blinking light through walls or clouds "like an image too of like Jesus coming back or something like that and that's very scary, you know." Tr. 49. Plaintiff stated that the hallucinations scare him and make him want to withdraw, take a nap, and keep to himself. Tr. 49–50.

Plaintiff confirmed that his motorcycle accident happened in Florida and that he moved in with his mom in November 2018 because he was unable to care for himself after his accident. Tr. 50. He stated that he was missing meals and not bathing properly. *Id.* He testified that his mother reminds him to bathe and take his medication and lays out his clothes because the decision of what to wear is overwhelming for him. *Id.* Plaintiff experiences severe posttraumatic headaches two-to-

4

three times per week. Tr. 50–51. He described the headaches feeling like "somebody's driving a nail into the side of [his] head" and they last anywhere from one-to-eight hours. Tr. 51. To get relief, Plaintiff stated that he has to lie down in a dark, quiet room. *Id.*

Plaintiff testified that he has constant pain in his mid and low back that goes down his right leg to his toes. Tr. 50–51. Plaintiff stated he has constant pain in his neck that goes to both shoulders. Tr. 51. Plaintiff confirmed that he had multiple fractures and has ongoing pain in both knees and wrists and his left ankle. Tr. 52-53. He has had surgery on his left knee, right arm, and right leg since the accident. Tr. 53. When his left knee swells, he uses a right-handed walker. *Id.* Plaintiff estimated he used the walker once a month for about a week. *Id.* Plaintiff also has some problems with his right hand and estimated he could use that hand for about 15 minutes before it would begin to cramp from pain. *Id.* Plaintiff stated that he is "[p]robably sitting" for most of the day and he will pace when he needs to get up. Tr. 54.

    2.    VE's Testimony

The VE classified Plaintiff's past work as: (1) pharmacy technician, Dictionary of Occupational Titles ("DOT") #074.382-010, light, SVP 3; (2) tire repairer, DOT #915.684-010, heavy, SVP 3; (3) cashier-checker, DOT #211.462-014, light, SVP 3; and (4) stock clerk, DOT #299.367-014, heavy but medium as performed, SVP 4. Tr. 55. The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's age, education, and experience who

> is in fact limited to a maximum of light work as we customarily define that, lifting 10 pounds frequently, 20 pounds occasionally; sit, stand or walk up to six hours each in an eight-hour day, with occasional use of ladders; frequent climbing stairs, balance, stooping, crouching, kneeling and crawling; frequent bilateral handling and fingering; occasional exposure to unprotected heights or dangerous moving machinery. This individual can perform simple, routine tasks. These jobs should have no fast-paced or team-dependent production requirements. This individual can tolerate occasional public contact and occasional changes in the workplace and/or work methods and with these restrictions in place, can concentrate on, focus and

> attend to work activities for at least two hours at a time with normal breaks through the workday.

Tr. 56. The VE testified the hypothetical individual would not be able to perform any of Plaintiff's prior jobs but could work in the following jobs: sales attendant, DOT #299.677-010, light, SVP 2, with approximately 72,000 jobs available nationally; inspector and hand packager, DOT #559.687-074, light, SVP 2, with approximately 94,000 jobs available nationally; bagger, DOT #920.687-018, light, SVP 1, with approximately 68,000 jobs available nationally. Tr. 57. The VE testified that the reasoning level for the bagger job is one, the reasoning level for the inspector and hand packager job is two, and the reasoning level for the sales attendant job is three. Tr. 57-58. The VE testified that those jobs would be precluded if the hypothetical individual could handle and finger only occasionally rather than frequently, could not maintain attention and focus for two hours at a time, or required more than the usual number of breaks in an eight-hour day. Tr. 58. Nor would there be any jobs available if the hypothetical individual could not consistently work eight hours a day, five days a week and would miss two or more days of work per month. *Id.* The VE stated that his testimony was consistent with the DOT, but that "the DOT does not cover a wording relating to working consistently eight hours a day, five days a week." Tr. 59. The VE also noted that there is "no information in the DOT relating to absenteeism and no information in the DOT relating to a worker requiring additional breaks." *Id.*

Counsel for Plaintiff asked if the jobs of sales attendant and bagger would be in conflict with the occasional public limitation. Tr. 59. The VE testified that some of the numbers would be reduced, but the jobs would be "primarily someone working out of a stockroom area and just keeping the sales floor stocked and then doing some cleanup for example and some work in the stockroom area." *Id.* Counsel had no further questions for the VE, but he asked the ALJ regarding the need for a physical consultation in addition to the psychological consultation that was

6

performed. Tr. 60. The ALJ indicated that he was "still thinking a bit about your request for a physical Consultative Exam." *Id.* With no further questions the hearing closed. Tr. 61.

II.   Discussion

    A.   The ALJ's Findings

In her May 20, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

    1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

    2.    The claimant has not engaged in substantial gainful activity since April 20, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

    3.    The claimant has the following severe impairments: degenerative disc disease, posttraumatic stress disorder, bipolar disorder, anxiety disorder, and a psychotic disorder due to a traumatic brain injury (20 CFR 404.1520(c) and 416.920(c)).

    4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ladders, ropes, and scaffolds; he can frequently climb ramps and stairs. He can frequently balance, stoop, crouch, kneel, and crawl; he can have occasional exposure to unprotected heights or dangerous moving machinery; and he can frequently handle and finger bilaterally. Claimant can perform simple routine tasks that do not have fast paced or team dependent production requirements. He can have occasional contact with the public; he can tolerate occasional changes in the workplace or work methods. With these restrictions in place, the

        claimant can concentrate on, focus and attend to work activities for two hours at a time with normal breaks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 30, 1981 and was 35 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 20, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 18, 21, 28–29.

    B. Legal Framework

        1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

9

A claimant is not disabled within the meaning of the Act if he/she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C. Analysis

Plaintiff contends the ALJ erred in her consideration of opinion evidence from his treating psychiatrist, Dr. Eric Kaplan, and that the Commissioner's decision is constitutionally defective because it violates the separation of powers. Pl.'s Br. 9, 19, ECF No. 13. The Commissioner argues Plaintiff's constitutional challenge lacks merit and the ALJ's consideration of Dr. Kaplan's opinion complied with the applicable regulations and is supported by substantial evidence. Def.'s Br. 8, 21, ECF No. 14. Because the court agrees with Plaintiff that the ALJ did not properly explain her

11

evaluation of Dr. Kaplan's opinion, the court remands on that issue and will not reach the merits of Plaintiff's constitutional challenge.

### 1. The ALJ's Consideration of Dr. Kaplan's Opinion

For benefits applications filed on or after March 27, 2017, such as Plaintiff's, the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources"). Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. §§ 404.1520b(c), 416.920b(c). This includes statements on issues reserved to the Commissioner such as whether the claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3).

Dr. Kaplan completed a medical source statement on June 11, 2020 and opined that Plaintiff could frequently follow work rules, rarely relate to others, rarely deal with the public, frequently use judgment, rarely interact with supervisors, rarely deal with work stresses, occasionally function independently, and rarely maintain attention and concentration. Tr. 804. Dr. Kaplan further opined Plaintiff could understand, remember, and carry out complex or detailed job instructions rarely and simple job instructions frequently. Tr. 805. Regarding his personal-social adjustment, Dr. Kaplan stated Plaintiff could occasionally maintain personal appearance, rarely behave in an emotionally stable manner, rarely relate predictably in social situations, and occasionally demonstrate reliability. *Id.* Regarding Plaintiff's ability to work, Dr. Kaplan indicated Plaintiff's mental impairments and treatment would require him to exceed the normal number of breaks during an eight-hour workday, interfere with his completion of an eight-hour workday, and cause him to miss more than four days of work per month. Tr. 805–06. He further noted Plaintiff did not malinger, his impairment had lasted more than 12 months and was reasonably consistent with the symptoms and functional limitations described in Dr. Kaplan's evaluation, and that the frequency and severity of Plaintiff's cognitive and psychotic symptoms produced occupational impairments making Plaintiff unable to work. Tr. 806. In support, Dr. Kaplan referred to his treatment notes and Plaintiff's mental status exam and indicated that Plaintiff exhibits poor attention and concentration, poor recall memory, auditory and visual hallucinations, anxiety, depressed mood, being overwhelmed, and irritability. Tr. 804–05.

The ALJ found Dr. Kaplan's opinion somewhat persuasive "as it supports limitations to simple, routine tasks, occasional public contact and limited changes present in the RFC." Tr. 27. However, the ALJ found "neither Dr. Kaplan's underlying records or other evidence in the file, support the extreme limits proposed." *Id.* Plaintiff argues the ALJ erred by failing to explain why

13

Dr. Kaplan's opinion was not supported by his own underlying records or consistent with the other record evidence. Pl.'s Br. 10. Because it is unclear from the decision as a whole which evidence the ALJ is relying on, the court agrees.

The record reveals a long history of psychiatric problems. In July 2016, before the alleged onset date, Plaintiff was involuntarily committed for psychiatric treatment after presenting to the ER with plans to shoot himself in the head. Tr. 403–67. Plaintiff reported two prior psychiatric hospitalizations. Tr. 411, 465. He noted a history of depression and substance abuse but denied hallucinations. Tr. 403, 410, 440. Plaintiff was diagnosed with major depressive disorder, alcohol use disorder, cannabis abuse, and anxiety disorder and discharged with prescriptions for Valium and Effexor. Tr. 414, 445.

In May 2018, after the alleged onset date, Plaintiff suffered a traumatic brain injury that apparently exacerbated his psychiatric symptoms, especially his mood disturbance and anxiety. *See* Tr. 721. Plaintiff began seeing a neurologist, Dr. Sanjay Yathiraj, shortly after his accident and reported staring off, forgetfulness, anxiety, trouble coming up with the right word in conversation, mood swings, intermittent anger, confusion, sleep disturbance, increased impulsivity and agitation, and fluctuating and inappropriate emotions. Tr. 727, 733, 736, 739, 742, 749, 756. Dr. Yathiraj ordered an MRI of Plaintiff's brain, EEG, and DTI, which were within normal limits. Tr. 740, 765, 768–69, 776. However, cognitive testing revealed problems with memory, executive function, attention, visual-spatial reasoning, verbal function, problem solving, and working memory. Tr. 740, 781–85. Plaintiff noted improvement in his symptoms with medical marijuana, CBD oil, and other medications.[5] Tr. 742. However, in July 2019, Plaintiff was still reporting increased anxiety, especially when his routine was disrupted or he was asked to do something out

---

[5] Plaintiff was living in Florida at the time, where medical marijuana was legal.

14

of the norm. Tr. 756. When that happened, Plaintiff would cry and/or feel outraged. *Id.* The ALJ considered this evidence, noting Plaintiff reported uncontrolled giddiness, confusion, fluctuating emotions, forgetfulness, and worsening symptoms; brain testing suggested cognitive and memory issues; diagnoses included pseudobulbar affect and uncontrolled PTSD; and Dr. Yathiraj's examination in June 2018 showed amnestic judgment, intact thought processes and language, intact mood, slightly agitated affect, and that Plaintiff was alert and oriented x2. Tr. 23, 24. The ALJ also noted Plaintiff's MMSE score in June 2018 was 25/30. Tr. 24. Notably, Dr. Yathiraj administered another MMSE in July 2019 and recorded a score of 14/30. Tr. 756.

In a March 2019 consultative examination, Plaintiff described the same functional limitations and symptoms that form the basis of Dr. Kaplan's opinion. The consultative examiner, Dr. Renuka R. Harper noted Plaintiff was able to focus his attention during the interview portion of the exam, did not ask her to repeat questions, and comprehended well, but that Plaintiff's presentation changed once they started testing. Tr. 720. During testing, Plaintiff seemed to forget instructions and gave up easily on tasks. *Id.* Plaintiff reported suffering continued short-term memory loss, PTSD, pseudobulbar affect, depression, anxiety, staring spells, and aggressive rages since the accident. *Id.* Plaintiff reported feelings of being overwhelmed, trouble riding in a car, changes in sleep habits, loss of energy, feelings of excessive guilt and worthlessness, concentration difficulties, crying spells, and social withdrawal. Tr. 721. Plaintiff also reported auditory hallucinations and paranoia. *Id.*

Plaintiff stated he had been hospitalized for depression, anxiety, and suicidal ideation seven times since age 21. *Id.* He had seen counselors over the years but was not receiving mental health treatment at that time, except for psychotropic medications prescribed by his neurologist. *Id.* On examination, Plaintiff's mood was depressed and affect slightly labile. Tr. 723. He responded to

15

questions appropriately and exhibited normal speech and logical, goal-directed thoughts. *Id.* On the Wechsler Adult Intelligence Scales – Fourth Edition ("WAIS-IV"), Plaintiff demonstrated borderline verbal comprehension and extremely low perceptual reasoning, working memory, and full-scale IQ. *Id.* On the Wide Range Achievement Test – Fifth Addition ("WRAT5"), Plaintiff read words at a ninth-grade level, comprehended sentences below a kindergarten level, and completed math calculations at a kindergarten to first grade level. Tr. 724. Dr. Harper believed Plaintiff was intentionally spoiling his responses and putting forth poor effort and thus found he was probably malingering. Tr. 720, 724–25. She opined Plaintiff would have no more than moderate functional limitations. Tr. 725. The ALJ rejected Dr. Harper's impression that Plaintiff was malingering and did not find her opinion persuasive to the extent she suspected Plaintiff did not have any functional limitations. Tr. 26. The ALJ said she did, however, consider the results of Plaintiff's testing with Dr. Harper in formulating the RFC. *Id.*

Dr. Kaplan's own treatment records also appear to support his opinion. Plaintiff was referred to Dr. Kaplan in September 2019. Tr. 787. In his initial evaluation, Plaintiff reported sustaining frontal lobe trauma in the motorcycle accident and being diagnosed with PTSD, pseudobulbar affect, and cognitive problems secondary to the accident. Tr. 788. He had been taking medication for aggression and mood swings. *Id.* Plaintiff complained of difficulty focusing his attention, being easily distracted, difficulty concentrating, difficulty with short-term recall memory, difficulty organizing his thoughts, slowed thinking, problems finding the right word, saying the incorrect word at times, needing to re-read information multiple times, and difficulty with multitasking. Tr. 789. Plaintiff denied problems with long-term recall memory, understanding what he reads, or basic math calculations. *Id.* Plaintiff complained of feeling depressed most of the time, being tearful each morning, feeling angry and irritable, severe generalized anxiety,

16

experiencing two or three panic attacks per week, insomnia, reduced interest levels and motivation, passive suicidal ideation, visual and auditory hallucinations, and nightmares. Tr. 790. Plaintiff reported a history of three psychiatric hospitalizations due to depressive episodes but denied other depressive episodes or symptoms prior to the motorcycle accident. Tr. 791.

On examination, Plaintiff appeared alert, cooperative, neatly dressed, and adequately groomed. Tr. 793. He had no evidence of psychomotor problems. *Id.* His mood was depressed and affect sad. *Id.* Plaintiff's speech was coherent and of normal speed and volume. *Id.* He was able to comprehend the information and questions asked of him. *Id.* His thought processes appeared to be coherent and logical. *Id.* He was oriented to person and place but did not know the correct date. *Id.* Plaintiff's attention span was fair and he was inattentive at times during the examination. *Id.* His long-term and immediate memory recall were intact but short-term memory was poor. *Id.* Plaintiff's calculation abilities and fund of knowledge were fair, judgment was fair to good, and insight was good. *Id.* Dr. Kaplan estimated Plaintiff to be of average intelligence. *Id.* Plaintiff's psychometric testing scores were consistent with severe anxiety, severe depression, and impaired cognitive functioning and indicated Plaintiff was not malingering. Tr. 793–94. Cognitive testing indicated Plaintiff needed improvement in memory, executive function, attention, visual-spatial reasoning, verbal function, problem solving, and working memory. Tr. 795. Dr. Kaplan diagnosed mild neurocognitive disorder due to traumatic brain injury, PTSD, psychotic disorder due to another condition (traumatic brain injury) with hallucinations, and major depressive disorder. Tr. 799.

Dr. Kaplan opined psychometric and psychological testing provided objective evidence of significant depressive and anxiety symptoms and neuropsychological testing provided objective evidence of significant cognitive impairment including impaired memory, executive functioning,

attention, visual spatial abilities, verbal function, problem solving, and working memory. Tr. 799. Dr. Kaplan noted Plaintiff's cognitive testing mirrored his testing from 2018 and provided objective evidence that his cognitive symptoms were not improving over time. *Id.* Dr. Kaplan found Plaintiff's cognitive deficits did not interfere with independence in everyday activities. Tr. 800. He found Plaintiff required psychiatric treatment and would continue to require treatment for multiple years, and probably for the rest of his life, because while his psychiatric disorders generally did respond to treatment, people with major depressive disorder and PTSD normally did not attain full remission. Tr. 801. Dr. Kaplan prescribed gabapentin for Plaintiff's anxiety and mood fluctuations and Olanzapine for insomnia, psychosis, and mood fluctuations and started him on a course of cognitive behavioral therapy. *Id.*

In October 2019, Dr. Kaplan noted Plaintiff had fewer psychotic symptoms but had generally not improved much since his initial examination. Tr. 807. In particular, Plaintiff's depressive, anxiety, and cognitive symptoms had not improved with medication. *Id.* Plaintiff's diagnoses remained the same and Dr. Kaplan changed and adjusted his medications. Tr. 808.

In November 2019, Dr. Kaplan noted Plaintiff was doing a little better. Tr. 809. Plaintiff was sleeping better, was less psychotic, and had noticed mild improvement in his attention span. *Id.* Plaintiff had no other cognitive improvements and no improvement in his anxiety. *Id.* Plaintiff's diagnoses remained the same and Dr. Kaplan adjusted his medications. Tr. 809–10.

In January 2020, Plaintiff continued to have "significant psychiatric symptoms." Tr. 811. Dr. Kaplan noted the severity of some of Plaintiff's symptoms had reduced with treatment but that Plaintiff was "still impaired." *Id.*

In March 2020, Plaintiff reported experiencing visual hallucinations about every other day and rare auditory hallucinations. Tr. 813. Plaintiff was sleeping and eating well, was still irritable

but less so, was less depressed, had no change in anxiety, and felt overwhelmed. *Id.* He still had reduced attention span, concentration, and recall memory but reported some mild improvement in cognition. *Id.* Dr. Kaplan continued Plaintiff's diagnoses and medications. Tr. 814.

In June 2020, Plaintiff had began taking Wellbutrin daily and reported feeling better with improved mood and cognitive function. Tr. 815. Plaintiff was still depressed a few times per month, still had visual hallucinations every day or every other day, and still had some difficulty with attention span, concentration, and recall memory. *Id.* He was still sleeping and eating well. *Id.* Dr. Kaplan increased Plaintiff's Wellbutrin dosage. Tr. 816.

In December 2020, Dr. Kaplan noted Plaintiff had been having a difficult time. Tr. 817. Plaintiff was having more frequent psychotic episodes, including brief visual hallucinations multiple times a day. *Id.* Plaintiff was more anxious, not sleeping well, and still had significant cognitive problems, but was not depressed and was eating well. *Id.* Dr. Kaplan increased the dosage of Plaintiff's antipsychotic medication. Tr. 818.

The ALJ considered Dr. Kaplan's treatment records, stating:

> Follow up psychiatric notes mainly consist of the claimant's subjective complaints. In October 2019, claimant reported that cognitive symptoms, depressive symptoms, and anxiety were not improved. In November 2019, the provider noted that the claimant needed to participate in cognitive demanding activities. In March 2020, there was mild improvement in cognitive symptoms. In June 2020, the claimant still complained of visual hallucinations. His diagnoses included mild neurocognitive disorder due to traumatic brain injury, PTSD, psychotic disorder, and depression. By December 2020, the claimant was complaining that he was more anxious and was having more psychotic episodes.

Tr. 24–25.

The ALJ's discussion of Dr. Kaplan's opinion does not include an explanation of or citations to which evidence she found to be inconsistent or unsupportive. *See* Tr. 26–27. Nor is it clear from the ALJ's discussion of Dr. Kaplan's treatment notes or the other record evidence which

19

evidence she relied on in finding Dr. Kaplan's opinion only somewhat persuasive. Dr. Kaplan's findings regarding the amount of work Plaintiff would likely miss both in terms of daily breaks and missed days per month, if credited, would preclude the available jobs identified by the VE. It was the ALJ's duty to explain why she did not adopt all the limitations identified in Dr. Kaplan's opinion and without this explanation or discussion of contrary evidence, the court cannot determine whether the ALJ's decision is supported by substantial evidence. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion"). For that reason, the court is constrained to remand this matter for further consideration of this issue. *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) ("[R]emand may be appropriate . . . where an ALJ failed to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.").

III.     Conclusion

The court's function is not to weigh evidence or substitute its judgment for that of the Commissioner but is to determine whether the ALJ's weighing of the evidence is supported by substantial evidence in the record. *See generally Hays v. Sullivan*, 907 F.2d at 1456 (noting judicial review limited to determining whether findings supported by substantial evidence and whether correct law was applied). Based on the foregoing, the Commissioner's decision is reversed and remanded for further administrative proceedings as set forth above.

**IT IS SO ORDERED.**

December 29, 2022                                                    Kaymani D. West
Florence, South Carolina                                         United States Magistrate Judge